**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,                                    Crim. No. 12-0045 (SRN/JJG)

                Plaintiff,

v.                                                                           **REPORT AND RECOMMENDATION**

Mark Edward Wetsch,

                Defendant.

---

JEANNE J. GRAHAM, United States Magistrate Judge

This case came before the undersigned United States Magistrate Judge for a pretrial motions hearing on August 27, 2012. Deidre Aanstad and Kevin Ueland appeared on behalf of the United States of America. Caroline Durham and Reynaldo Aligada, Jr., appeared on behalf of Defendant Mark Edward Wetsch. Following the hearing on these motions, Defendant has exercised his right to proceed pro se and has represented himself since September 12, 2012. Since the hearing on these motions, the case has progressed significantly. In a report and recommendation dated February 8, 2013 (ECF No. 267), the Court recounted many of the noteworthy procedural developments that have occurred since Defendant began to proceed without the benefit of counsel.

Defendant is under indictment for thirteen counts of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d). The robberies with which Defendant is charged occurred on March 9, 2011; April 26, 2011 (two robberies); May 13, 2011; June 13, 2011; November 4, 2011; November 9, 2011; November 22, 2011; December 20, 2011; December 22, 2011; December 27,

2011; December 29, 2011; and January 3, 2012. Defendant was taken into state custody on January 3, 2012, and he has remained in either state or federal custody since that date.

At the August 27, 2012, hearing, the Court heard testimony from Detective Travis Sandland ("Detective Sandland" or "Sandland"), of the St. Peter Police Department, Officer Lucas Belgard ("Officer Belgard" or "Belgard"), a patrol officer with the St. Peter Police Department, and Federal Bureau of Investigation ("FBI") Special Agent Drew Helms ("Agent Helms" or "Helms"). The Court has not taken any other testimony. The Court received eight Government exhibits into evidence: (1) two Nicollet County search warrants and applications for a 2011 Ford Edge with a Minnesota license plate 335EDC; (2) a Hennepin County search warrant application and warrant for 3036 Grand Avenue South, #302, Minneapolis, Minnesota; (3) a Nobles County search warrant application and warrant for Mark Edward Wetsch's DNA; (4) a U.S. District Court search warrant application and warrant for an Apple iPhone; (5) a St. Peter Police Department squad video from the January 3, 2012 traffic stop; (6) a video of Mark Edward Wetsch's statement made in Nicollet County on January 3, 2012; (7) an FD-395 advice of rights form for the Nicollet County statement on January 3, 2012; and (8) a video of Mark Edward Wetsch's statement in Sherburne County on January 3, 2012. (ECF No. 62.)

Before the Court are Defendant's motions to suppress evidence. In his first motion, Defendant seeks to suppress the evidence obtained in connection with the warrantless search of his person at the time of his arrest, the searches of his vehicle performed with and without a warrant, the search of his apartment pursuant to a warrant, the search used to obtain his DNA pursuant to a warrant, and the search of an Apple iPhone pursuant to a warrant, as well as the

fruits obtained from those searches. (ECF No. 47.)[1] In his second motion, Defendant seeks to suppress his statements obtained by government officials in the Nicollet County Sheriff's Office and the Sherburne County Jail, and the fruits of those statements. (ECF No. 48.)[2]

As described below, the Court recommends that Defendant's motion to suppress evidence be denied and his motion to suppress statements and admissions be granted in part and denied in part.

# I. Factual Background

## A. St. Peter and Brewster Bank Robberies

On December 22, 2011, Wells Federal Bank ("Wells Federal") was robbed in St. Peter, Minnesota. Detective Sandland was one of the primary investigators of the Wells Federal robbery. After the Wells Federal robbery occurred, Sandland obtained information regarding many other robberies from a bank robbery working group including both local law enforcement and the FBI. While he never attended any meetings of the working group, he had "approximately 40 to 45 pages of information" compiled as a result of the group's combined efforts. (Aug. 27, 2012 Hr'g Tr. at 12:25-13:5, ECF No. 66 [hereinafter "Suppression Hr'g Tr."].) Law

---

[1] On December 10, 2012, Defendant filed a duplicative "Motion to Suppress Apple iPhone Evidence." (ECF No. 172.) The Court summarily denied that motion as duplicative. (Order at 6, Dec. 14, 2012, ECF No. 191.) The Court acknowledged, "Defendant's first motion to suppress evidence, which *includes suppression of the Apple iPhone* and the fruits of searching the phone, is still under advisement." (*Id.* (emphasis added).)

[2] Defendant also asks the Court to require the Government to make offers of proof verifying eleven specific facts as testified to by the Government's witnesses, or, in the alternative, he asks the Court to bar the admission of those facts into evidence at trial. It is clear from Defendant's requests that he is attempting to attack the credibility of the witnesses. (*E.g.*, Def. Br. Resp. to Aug. 27, 2012 Pretrial Mot. Hr'g at 26, ECF No. 166 ("Offer of proof to verify Sandland's testimony"; "Offer of proof to verify Officer Belgard's testimony .") The Court has heard Defendant's objections to the Government's offered testimony and makes its credibility determination below. The Court will rely on that testimony accordingly.

enforcement believed the serial bank robber had committed approximately thirty bank robberies in the Twin Cities metro area and greater Minnesota.

The Wells Federal robbery occurred on December 22, 2011, at approximately 6:55 a.m. Detective Sandland testified the vehicle used in the Wells Federal robbery was described as a "Silver or light-colored SUV with . . . a rounded front end and a squared off back end." (Suppression Hr'g Tr. at 11:15-17.) Sandland testified that the witness could not originally identify the specific make or model of the vehicle, but upon being shown a picture of a Ford Edge, she positively identified that make and model as the one, or similar to the one, parked near Wells Federal during its robbery. A Ford Edge was used in "several of the robberies" included in the bank robbery working group's findings. (Suppression Hr'g Tr. at 13:6-9.) In his report following the initial investigation of the Wells Federal robbery, Sandland included the witness's description of the vehicle as being "light colored." (Pro Se Ex. List, Ex. A4 at 1, ECF No. 178.)

Detective Sandland also recounted a description of the alleged robber as "[a]pproximately five feet ten inches to six feet tall, a slim to a medium build, white male wearing a black ski mask, a hat, and a dark-colored jacket." (Suppression Hr'g Tr. at 12:10-14.) As for the handgun, Sandland testified that it was "described as a smaller revolver style handgun with a round wooden handle, which is revolver style [sic] isn't as common anymore as it had been in the past, so that was what was similar between the two." (Suppression Hr'g Tr. at 12:19-22.)

On January 3, 2012, at approximately 11:50 a.m., the Rolling Hills Bank and Trust ("Rolling Hills") in Brewster, Minnesota, was robbed. A lone man approached a teller, displayed a small black revolver, and demanded cash. The man was wearing a black mask, which was consistent with the Wells Federal robbery. The teller gave the man money from her drawer,

including ten pre-recorded bait bills. When the suspect left the bank, witnesses observed a "silver SUV" leaving the scene. (Suppression Hr'g Tr. at 12:3.) The initial report was that the suspect in the Rolling Hills robbery was a black male. Sandland testified that the information regarding the Rolling Hills robbery came from a computer report comprised of information compiled from other officers engaged in the investigation of the Rolling Hills robbery.

### B. Traffic Stop

Detective Sandland was advised of the Rolling Hills robbery and the details thereof shortly after it occurred. Sandland determined that, because a nucleus of similar robberies occurred in or near the Minneapolis/St. Paul area (the "Twin Cities") and because of the similarities between the Twin Cities robberies and the Rolling Hills robbery, it was likely that the Rolling Hills robber was traveling toward the Twin Cities. There was a witness report that the suspect was traveling north on Highway 60. (Suppression Hr'g Tr. at 13:11-15, 45:11-13.) Based on Sandland's familiarity with the Minnesota highway system, he concluded the suspect would most likely travel on Highway 60 until it connected to U.S. Route 169, which is the most direct route to the Twin Cities metro area. (Suppression Hr'g Tr. at 15:10-13.) Because Route 169 traveled through St. Peter, the location of the December 22, 2011 Wells Federal robbery, Sandland determined it was likely that the suspect would drive through St. Peter en route to the Twin Cities.

Based on his own experience driving from St. Peter to Worthington, Minnesota—a town adjacent to Brewster—Sandland determined a driver traveling from Brewster to the Twin Cities, following Highway 60 to Route 169, would travel through St. Peter between approximately 1:10 p.m. and 1:20 p.m. Based on that determination, he positioned himself on Route 169 in an area from which he could view passing traffic. Detective Sandland also enlisted Officer

Belgard's assistance to monitor Route 169 for a silver SUV. While he waited, Detective Sandland contacted the Worthington Police Department to confirm the suspect's description. They explained the suspect was actually a male of unknown race with a black ski mask.

At approximately 1:11 p.m., while Detective Sandland was on the telephone with the Worthington Police Department, he witnessed a silver-colored Ford Edge traveling north on Route 169. As the suspect vehicle drove past, Sandland observed what he believed to be a lone white male driver in the vehicle, wearing a dark-colored jacket. Sandland "pulled out on to the highway and called ahead to [Officer Lucas Belgard] . . . to verify that it was a white male driving." (Suppression Hr'g Tr. at 18:4-6.) Detective Sandland also verified the vehicle's registration by verifying its license plate number. Detective Sandland testified that the vehicle was registered to "PV Holding Company," which Sandland believed to be a car rental company in Minneapolis. (Suppression Hr'g Tr. at 18:14-15.) Officer Belgard verified that that driver was a white male.

Based on the vehicle description, the driver's physical description, and the vehicle's passing through St. Peter at the time Sandland determined would be consistent with leaving Brewster and heading to the Twin Cities, along with Sandland's recollection of the Wells Federal robbery and the bank robbery working group notes, he initiated a traffic stop. Upon seeing the lights and hearing the sirens, Defendant pulled his vehicle to the side of the roadway. Detective Sandland's unmarked squad car was behind Defendant's vehicle, near the ditch, and Officer Belgard's marked squad car was nearer to the road. Sandland approached the driver's side window and Belgard approached the passenger's side window, crossing paths with each other en route to the vehicle. Neither officer had his gun drawn at any point during the traffic stop.

Officer Belgard cupped his hands around his face in an effort to see inside the tinted windows of Defendant's vehicle.

Upon making contact with Defendant, Detective Sandland noticed Defendant's hands "shaking visibly." (Suppression Hr'g Tr. at 20:22-23.) Sandland immediately asked Defendant to step out of his vehicle and stand behind the SUV, in the sight of Officer Belgard's ICOP Video Recorder. Detective Sandland noted that the "physical description still matched" the other information law enforcement had gathered regarding the serial bank robbery with a matching *modus operandi*, including "that the eyebrows were a reddish-blond color." (Suppression Hr'g Tr. at 22:2-6.) Officer Belgard wore a wireless microphone, but he was not standing directly beside Defendant or Detective Sandland. Neither officer pat searched Defendant, which Detective Sandland later acknowledged was a mistake.

After asking Defendant to step out of his vehicle, Detective Sandland stated:

> I'm going to be very blunt with you, OK?. . . There was an armed robbery in Brewster. And we've had an armed robbery here. This vehicle matches and your description is pretty close . . . . Is there a problem if we look in your vehicle? [Unintelligible] Guns? Knives? Anything like that?

(Gov't Ex. 5.)[3] While the audio is somewhat unclear, Defendant clearly says "No" multiple times in response to the questions of whether there was a problem to look in the vehicle or whether there were guns or knives present in the vehicle. Sandland's testimony coincided with the recording.

At this point, Officer Belgard walked toward Defendant and Detective Sandland and asked Defendant, "Do you mind if I look in there?" to which Detective Sandland responded, "Go ahead." A moment later, someone said, "OK." It is unclear whether Defendant or Officer

---

[3] The Government submitted Exhibit 5 as a video without a transcript. The transcriptions are from the Court's review of the exhibit.

Belgard said the final "OK" immediately before Belgard opened the vehicle door. Officer Belgard testified, however, that Defendant "said 'okay' or nodded or acknowledged that I asked him that." (Suppression Hr'g Tr. at 65:6-7.)

Officer Belgard next opened the door of the vehicle and searched its interior. As Belgard opened the door, Defendant and Sandland drifted to the passenger side of the car and watched as Belgard opened the door and began his search. At no point did Defendant ask Belgard to stop or in any way object to the search of the vehicle's interior, nor did Defendant appear surprised or upset by what Belgard was doing.

Upon searching the vehicle, Officer Belgard discovered cash and the handle of a gun in the vehicle's center console. At that point, Officer Belgard and Detective Sandland directed Defendant to the hood of the squad car and notified him that he was not under arrest but that Detective Sandland would be putting handcuffs on him and placing him in the back of Officer Belgard's squad car.

Sometime later, still at the scene of the traffic stop, Agent Helms arrived and spoke with Defendant in the rear of Officer Belgard's police cruiser. While Helms was in the squad car, the car's internal microphone was operating, but the audio recording is still somewhat muddled due to the background noise. Only parts of the conversation are intelligible, but Agent Helms testified that he did not advise Defendant of his *Miranda* rights prior to speaking with Defendant. Agent Helms and Defendant spoke for approximately four minutes. One of the topics of conversation was Defendant's desire to get "into fed custody."[4] Agent Helms testified that he understood "fed custody" to mean "federal custody." (Suppression Hr'g Tr. at 79:18-20.) Shortly

_____

[4] Defendant does not move to suppress the contents of any statements stemming from the conversation in the backseat of the squad car. Instead, Defendant moves to suppress *only* the statements given while at the Nicollet County Sheriff's Office and Sherburne County Jail and the fruits thereof.

after the conclusion of Agent Helms's brief discussion with Defendant, Officer Belgard transported Defendant to the Nicollet County Sheriff's Office where Defendant was interviewed.

### C.  Nicollet County Sheriff's Office

Upon arrival at the Nicollet County Sheriff's Office, Defendant was placed in Investigator Marc Chadderdon's ("Investigator Chadderdon" or "Chadderdon") office, which contains both videotaping and audiotaping equipment. At the commencement of the interview, Agent Helms read the standard FBI FD-395 Advice of Rights Form, which contained a *Miranda* advisory and waiver. (Gov't Ex. 7.) Helms indicated that the top section, which included the *Miranda* rights, was Helms's part and the bottom section, which contained a statement of understanding and waiver, was Defendant's part.

Immediately upon being presented with an opportunity to sign the waiver of rights, Defendant stated:

| Defendant: | Well, I, you know I want to probably talk to an attorney, it's just a matter of do I want to talk to you before I talk to the attorney . . . . If I talk to you you're going to ask me questions, you're going to ask me if I was involved and other questions as well. |
|---|---|
| Helms: | And again, you can pick and choose which ones you want to answer and which ones you don't. It's entirely up to you. |
| Defendant: | Well I'd like to talk to you, you know. Like I said in the car, I'd rather be up in Minneapolis talking to you. |
| Helms: | How come – why does that make a difference? |
| Defendant: | If I'm going to be in custody, I'd rather be in custody in Sherburne County. |
| Helms: | It's two o'clock in the afternoon. You're in St. Peter, Minnesota. I just can't pick you up and drive |

|                | you to Sherburne, at least right now. It's something we could probably do either later this evening or first thing tomorrow morning. Like I said, I've never been inside Nicollet's jail, but I'm sure it's fine. So I mean, talking to me will hopefully help clear your conscience and get you on the road to where you need to be. Whether it's here or Sherburne somehow it matters to you – |
|----------------|----------------------------|
| Defendant:     | Mm-hmm.                    |
| Helms:         | – I'm not sure I'm not going to get you there without chit-chatting. They're working on what they have to work out as far as what happened earlier today in Brewster and your car stop and things like that. |
| Defendant:     | Mm-hmm.                    |
| Helms:         | And if you've been through this before and if you feel like "Oh, geez I don't want to put my name on anything," I'm ok with that too. You at least understand what your rights are. I can put this [FD-395] away and we can move on and talk. It's entirely up to you. You know what we're going to do as far as putting a case together. |
| Defendant:     | Right.                     |
| Helms:         | You can either say "Yep," man up, "This is why I did things, this is why or how they happened," or "I don't want to talk," which – |
| Defendant:     | Again, I'm willing to talk to you but I'd like some kind of assurance that I can be up in Minneapolis today. I don't know how – logistically if that's possible. |

(Gov't Ex. 6.)[5]

Agent Helms did not directly address Defendant's request for an assurance that he would

be transported to Minneapolis, but rather he inquired as to why Defendant wished to be

_____

[5] The Government submitted Exhibit 6 as a video without a transcript. The transcriptions are from the Court's review of the exhibit.

transported to Minneapolis. Agent Helms described the difficulties with getting Defendant into federal custody. Specifically, Helms advised Defendant that the robbery was currently a Nobles County case. The two engaged in further discussions, during which Defendant asked whether another FBI agent, Dave Kukura, was available, because Defendant had some experience with Agent Kukura. Helms again reiterated that, because it was not a federal case, it would be difficult to transport Defendant to Sherburne County. Helms stated, "I could get Dave Kukura on his way down here for the day, if he's working. . . . Would you like Dave to come down? I understand wanting to get up north . . . ." Defendant remarked "Well, that's my big thing is wanting to get up to Minneapolis." Helms allowed Defendant to speak to Agent Kukura on the telephone to notify Kukura that Defendant had been arrested and to ask Kukura to contact Defendant's wife and tell her about the current situation. Helms and Defendant continued to talk about Defendant's history for a short while longer.

   After a few moments of silence, the two engaged the following dialogue:

| | |
|---|---|
| Defendant: | I mean, I probably should talk to a public defender, a federal public defender. |
| Helms: | And I can't stop you from doing that, but I can guarantee what he'll say is "Jesus Christ, don't talk to the FBI" – |
| Defendant: | Right, of course |
| Helms: | – which is fine and dandy, and that's your right, to have an attorney . . . just as we went over with your rights. I don't know how it went with Dave, and whatnot, if you confessed, or you know, talked about it or anything like that. But speaking with an agent, or an officer, or whatever it is in law enforcement, gives someone an opportunity to tell their side of the story. As opposed to letting the U.S. Attorney's Office to speak on their behalf. You know what I mean? The only time that a person that's been charged with a crime gets to speak their |

case is usually sentencing . . . which, if you're as busy as I think you've been, there's a lot of work, you know, or a lot of explanation why Mark would be this busy. You know what I mean? A flight to Africa – very expensive. I don't know if it's a wedding present, or going to meet the family, or what. Um, but that's certainly some sort of reason or explanation of why somebody would do something extremely out of their character. But again, that type of thing never gets to come out without saying to me today, at 2:15, let's start from the beginning. Because I can record in my notes and in my eventual report, emotions and feelings that normally don't get to come out anywhere else.

Defendant:     I mean, if you can get me to Sherburne County today, I'll talk with you and Dave [Kukura], otherwise I'm just inclined to plead the Fifth now until I talk to an attorney.

Helms          Ok. I'll see what I can do –

Defendant:     I wanna, I mean, I wanna cooperate with you. But, . . . I mean, there's no but . . . .

[Approximately seven seconds of silence.]

Helms:         I asked Glenn to do a couple things, one of which was find out, procedural wise, you know, right now we have an armed robbery in Brewster. Minnesota state statute. You know what I mean? Right now we're gathering the evidence to take it before the federal system but that's going to take some time. And, you know, unless you write out a statement that says, "I voluntarily promise to go with Drew to Sherburne County and talk with him and Dave Kukura . . ." Just out of . . . you know what I mean? Cause it looks like I am transferring you around, you know what I mean? Um, and I – who knows what is going to happen six months from now. For all I know Mark's gonna . . . "Oh yeah, they drug me from St. Peter and then we went to the backwoods and they beat me and then they took me . . . ."

Brewster. This morning. [Gestures drawing a line.] Cause that could get us . . . Hell, that could probably get us on our way, on a probable cause arrest. I would have to go through the U.S. Attorney's Office to get clearance for, I guess, to get us on our way into fed custody. That'd be a starting point.

Defendant:    I'll sign a document saying I am voluntarily going with . . . if that's what you're asking to . . . try to . . . I mean I would do that.

Helms:    Yes and no. I was kind of light-heartedly doing that. But, um, like I said before right now we have an investigation on a state statute – an armed robbery. I think once we get a search warrant, go into the car, match up the bait bills that I'm confident we're going to find, then we have a federal crime, but that is probably going to be a couple hours from now. We could spend some time, and talk about the issues before us, where that would also add to me getting it into the fed system that much quicker. If I could get somebody to say [raising his hand] "I robbed that bank this morning in Brewster. I robbed that bank the other day in St. Peter. That was me in Hastings . . . ." Or whether it was or not, that would get me, in the federal system that much faster. And if I had . . . if we did chit-chat about those things, then I could get you another soda, go make a call to the U.S. Attorney's Office, and say "He's already said XYZ, do I have your . . . " because I have to kind of get permission to get . . . a probable cause . . . because they like to either indict, or information, or a complaint, "Do I have your permission to arrest him on federal bank robbery charges today because he wants to go to Sherburne. And I'd either get a "yes" or a "no." And I think I'd probably get a "yes" because this would be a big deal.

Defendant:    Well, I did rob the bank in Brewster this morning, but that's all I'm going to say right now, but I did rob the bank in Brewster.

(Gov't Ex. 6.) At that point, Detective Sandland placed Defendant in handcuffs and the substantive part of this phase of the interrogation ended.

Approximately thirty minutes after Defendant confessed to the Brewster robbery, Agent Helms returned to Investigator Chadderdon's office and discussed Defendant's rights again. Referring to the FD-395, Agent Helms stated that he and Defendant had talked about the rights contained in it and that Defendant "certainly underst[ood] that stuff" but did not feel comfortable signing the waiver portion of the form. Agent Helms acknowledged Defendant's comments about talking to a lawyer or a public defender, but asked:

> You didn't request one right now, is that correct? Are you requesting to have an attorney right here, right now? This is kind of just if we can keep even a low level of chit-chat, know what I mean. And again, you don't have to answer anything you don't feel like answering, but if you say "yeah, I think I should have an attorney" then we're pretty much done chatting, you know what I mean? Um, so I guess I'm just asking you for a clarification.

(Gov't Ex. 6.)

Defendant responded, "Yeah, like I said, um, I'm just kind of repeating myself, but if we, if I can't get up to Sherburne County today, then I'm, you know, I'm probably, I'm requesting an attorney." Agent Helms clarified again, asking, "But if I get you up to Sherburne County, then what? I'm not going to ask you any questions, but let's pretend for a second, we're on our way to Sherburne County." Defendant responded, "If Dave can meet us up there, I can sit down and talk with you and Dave." Agent Helms asked, "About today, and other things?" Defendant responded, "Yeah." Some sporadic innocuous chatter continued, but Defendant remained mostly silent from that time forward.

During the interview, Defendant appeared calm throughout his discussion with Agent Helms. Defendant spoke deliberately and never reacted quickly to any of Agent Helms's

statements. Instead, Defendant was reserved and thoughtful throughout the interview. Moreover, it bears repeating that Defendant reiterated his desire to be detained in Sherburne County numerous times.

Defendant remained in Investigator Chadderdon's office awaiting transfer from the Nicollet County Sheriff's Office to the Sherburne County Jail. Immediately before Defendant was taken from Investigator Chadderdon's office, Agent Helms entered and asked Defendant whether it was alright if Agent Helms did not travel to Sherburne County. Agent Helms asked, "Are you okay if I don't go but [Agent Glenn Moule] goes or would you really like me to be there?" Defendant indicated that it was acceptable for Agent Helms to stay behind and for Agent Moule to accompany Defendant to Sherburne County. Defendant was ultimately transferred to Sherburne County Jail. The record does not include any discussions or statements made during the transfer, and Defendant remained in custody throughout.

### D.    Sherburne County Jail

The video of the Sherburne County Jail interrogation begins with Detective Sandland and Agent Kukura in an interrogation room with Defendant. (Gov't Ex. 8.)[6] Detective Sandland was mid-sentence when the video began. Sandland began by recapping the day's events, including law enforcement's efforts to comply with Defendant's requests. He also discussed briefly the differences between the state and federal investigations.

Before posing any questions to Defendant, Detective Sandland read Defendant his *Miranda* rights from a pre-printed card. When asked whether he understood his rights and would be willing to speak with law enforcement, Defendant first said, "I do." Detective Sandland asked if, with those rights in mind, Defendant would be willing to speak with him. Defendant

---

[6] The Government submitted Exhibit 8 as a video without a transcript. The transcriptions are from the Court's review of the exhibit.

responded by asking what would happen next with regard to whether he would remain detained in Sherburne County. Detective Sandland advised that it was his understanding that Defendant would remain in Sherburne County. With that in mind, Sandland asked again whether Defendant was willing to speak with Sandland and Agent Kukura. Defendant responded:

> Defendant: You know, I do understand my rights, first of all, and like I said down in St. Peter I'm willing to talk and cooperate, . . . I've been through the system before, as Dave knows, and I know if an attorney were to be, I'm sure an attorney would say "don't say anything until you talk to an attorney," so I'm a little concerned about that. Rather than – like you said, anything I say is going to be held against me in a court of law . . . .

> Sandland: We're here because we're offering you an opportunity to explain what was going on, why . . . . Sometimes there are reasons things happen, and we don't understand those reasons. And we want to be here to . . . as much as we are here to prosecute a case, we are here to understand your – what was going through your head at the time. There's feelings, there's emotions, there's a lot going on in people's lives that we don't know about, because we're not there when this is happening. Obviously, stuff's been going on for a long time. And there's got to be a reason. From talking to Dave a little bit . . . .

> Kukura: Well, you've told me a little about what's going on in your personal life, and you've got to assume this has something to do with some of that, Mark.

> Defendant: Yeah, I mean, there is no justification for what I did today. Nothing I say is going to justify what I did.

Sandland and Kukura sought an explanation of why Defendant robbed the bank in Brewster. Defendant noted the difficulty of finding a "decent paying job" after getting out of prison and needing a way to take care of financial responsibilities. Defendant stated he often lost sight of taking care of his own needs and putting others' needs ahead of his. Sandland advised

Defendant that this was an opportunity to take care of himself by addressing the robberies. Detective Sandland suggested that this was an opportunity to deal with Defendant's past. Defendant responded:

> Defendant: Yeah, I'm aware of all that and I think I'm looking at pretty significant time this time around – some real prison time, you know? Like I said, I am willing to cooperate and talk, you know, I'm just wondering if it is to my advantage, you know, I know, to have an attorney advise me, you know. I am one that – I want to accept responsibility for what I've done – I have done it in the past –
>
> Sandland: That's what I understand.
>
> Defendant: – And I want to do it again, you know? I just wonder, before I do that – I just want to make sure I'm protecting myself as well, considering.
>
> Sandland: And as Drew explained to you, that's your right. I can't tell you one way or the other. I know your intent is to get to the federal level so you can be in federal custody. All what we're dealing with is Nobles County, City of Brewster. With that being said, there's there is the high likelihood that if we only are talking about dealing with Brewster at this point and then we have to take care of each of these other incidents at another time that you'll be back to Nobles County fairly soon and held there . . . . I can't sit here and tell you "talk to an attorney" or "don't talk to an attorney." That's up to you. If we work through each of these incidents . . . it is more likely to become a federal level case down the line.

Agent Kukura picked up the conversation by discussing personal issues affecting Defendant and encouraging him to clear up some of the problems that had arisen as a result of the Brewster bank robbery and any others that had occurred. Kukura agreed with Defendant's assessment that he was likely facing prison time and said:

> Kukura: If you could help us with some of the things that have been going on. If you could help us with

> where some of the money is at, try to recover some
> of it, that can only help you. Obviously I can't make
> any promises – you know how the system works,
> I'm not a prosecutor – but they're going to look for
> those types of things when they're looking at "what
> did Mark do, and what did he do to make it right?"

Defendant asked whether Kukura had spoken with Defendant's wife; Kukura acknowledged he

had not. The two continued to discuss some of Defendant's personal problems, with which Agent

Kukura was familiar. After a brief silence, the conversation continued:

> Kukura:      Well I know they'd like to get as much of it, you
>              know, cleared up as they can, Mark –
>
> Defendant:   I, um, admitted to one today . . . there's been others,
>              but again, I just, my mind is in a fog right now.
>
> Sandland:    How about this . . . how about this – I know you,
>              you said there's been others. Let's work through
>              Brewster. Are you comfortable with that?
>
> Defendant:   Mm-hmm.
>
> Sandland:    Let's work through Brewster. What happened this
>              morning? Ok, before we even get into that, ok, I
>              want to make sure Mark, with you, that you're
>              comfortable, and you kind of hemmed and hawed
>              you know, thinking about an attorney. And whether
>              or not he could do that, but are you comfortable
>              talking to me about Brewster without an attorney
>              present, currently?
>
> Defendant:   By and large.
>
> Sandland:    And you can stop – you don't have to answer
>              particular questions if you don't want to, ok? You
>              can pick and choose what you answer and hopefully
>              I'll be able to work through this with you enough
>              that you're comfortable with me in answering this
>              without an attorney present, correct?

At that point, Defendant began recounting how he had planned and executed the Rolling

Hills robbery in Brewster. He explained that he pulled out a map and looked for a town with a

bank because he was leaving for Africa the next morning and needed more money for the trip. Defendant stopped in a few other towns, looking for the "right opportunity," but determined the banks were too busy. Defendant described how he settled on the bank in Brewster, the clothes he was wearing when he robbed the bank, the toy gun he used, and the chronology of the robbery. Defendant also noted that he rented the vehicle used in connection with the Rolling Hills robbery "shortly after he got out [of prison in October]."

At the conclusion of the discussion about the Rolling Hills robbery, Detective Sandland brought up the Wells Federal robbery in St. Peter again and asked whether Defendant was comfortable discussing it. Defendant responded, "Like I said, I want to take responsibility for everything that I've done, but I just . . . I want to put people's fears aside if they have a fear." Confirming Defendant's concerns about whether people were scared, Detective Sandland continued questioning Defendant, asking if Defendant could "work with [Sandland] on St. Peter." Defendant said, "You know I just have to look out for myself. I want to work through everything, but I also want to make sure that Mark is protecting himself." Detective Sandland and Agent Kukura talked with Defendant about the other robberies, possibly numbering up to 28 in total, and Sandland asked about discussing only Brewster and St. Peter. Before responding to those questions, Defendant inquired about speaking with his wife and sought to notify her of his incarceration. Sandland and Kukura explained that notifying her was not possible at that time until certain procedures had been followed.

Finally, Defendant stated:

> I'm sure my house has already been searched. Um, I want to cooperate and I want to say everything – that is from the innermost part of my heart. That is what I fully intend to do. But maybe I should have an attorney present then. I want to say everything. I am a little concerned that there is not – I want to make sure I am protected to a certain extent.

Detective Sandland acknowledged that it was "pretty clear" at that point that Defendant wanted to speak with an attorney before continuing his interview. Accordingly, the interview terminated at that time.

### E.    Search Warrants

In the process of investigating this matter, the Government obtained five search warrants. The contents of the affidavits in support of each search warrant application and the parameters of the resulting search warrants are recounted below. The Court sets forth the contents of the warrant applications as well as the affidavits in support thereof.

### 1.    Search Warrants for Defendant's Vehicle

#### a.    January 3, 2012 Application

On January 3, 2012, Investigator Chadderdon applied for a motor vehicle search warrant expecting to find United States currency, including pre-recorded bait bills, a black revolver handgun, a black jacket with red lining, and a dark ski mask inside the motor vehicle. The vehicle was described as a "2010 Ford Escape, silver in color with Minnesota registration 335 EDC." (Gov't Ex. 1 at 1-1.) Investigator Chadderdon based his application for a search warrant on the following facts.

On January 3, 2011,[7] a man entered the Rolling Hills Bank, 224 10th St. Brewster, Minnesota, wearing a mask or another clothing item that concealed most of his face, a black jacket, and blue jeans. The man approached a bank teller and while displaying a small black revolver made a verbal demand for cash. The teller complied and provided him with money from her drawer, which also included ten dollar bills of pre-recorded bait money. The suspect then fled the bank. A witness observed a silver SUV leaving the area, heading north on Highway 60.

---

[7] The search warrant application erroneously listed the year as 2011, rather than 2012.

At approximately 1:12 p.m., Detective Sandland and Officer Belgard observed a white male in a silver SUV traveling north toward St. Peter. Sandland and Belgard initiated a traffic stop, asked the man to exit the vehicle, and sought his consent to search the vehicle to eliminate him as a suspect. The driver was later identified as Defendant. Defendant twice gave his consent to search the vehicle. Officer Belgard searched the glove compartment and the middle console of the vehicle and found "a large amount of loose United States currency and the grip of a handgun." (Gov't Ex. 1 at 1-2.) Sandland and Belgard then handcuffed Defendant for officer safety. Defendant was questioned at the Nicollet County Sheriff's Department, at which time he admitted to robbing the Rolling Hills Bank.

Based on Investigator Chadderdon's affidavit, the court found probable cause existed to search a "2010 Ford Escape, silver in color with Minnesota registration 335 EDC" and issued a search warrant to that effect.

### b.        January 4, 2012 Application

On January 4, 2012, Chadderdon applied for a second warrant to search the vehicle. The January 4, 2012 vehicle search warrant application and search warrant more accurately and specifically described the motor vehicle to be searched as a "2011 Ford Edge, silver in color with Minnesota registration 335 EDC VIN # 2fmdk4kc1bba779356," as opposed to the January 3, 2012 warrant application and search warrant, which described the vehicle as a "2010 Ford Escape" and did not contain the VIN number. Chadderdon signed the search warrant application in the presence of a judge of the Minnesota state court. The resulting search warrant authorized law enforcement to search the 2011 silver Ford Edge with Minnesota registration 335 EDC and a VIN number of 2fmdk4kc1bba779356.

## 2.    Search Warrant for Defendant's Home

On January 3, 2012, Deputy Tom Sonenstahl of the Hennepin County Sheriff's Office applied for a warrant to search Defendant's home expecting to find clothing, money from proceeds of robberies, documents, notes and ledgers relating to financial records, and electronic storage devices. (Gov't Ex. 2.)

Deputy Sonenstahl recounted the facts of the Rolling Hills robbery, noting that it took place on January 3, 2012, and that the police stopped a 2011 silver Ford Edge with the license plate number 335-EDC. According to police reports on which Deputy Sonenstahl relied, the suspect was a lone white man wearing dark pants, a dark coat with red interior lining, and a ski mask, and who carried a gun.

Police identified the driver as Mark Edward Wetsch. During the course of searching the vehicle, the officers found various items, including a black toy handgun and a large sum of money, including pre-recorded bait bills from the Rolling Hills Bank. Deputy Sonenstahl also learned that Defendant listed his home address as 3036 Grand Ave. S., #302, Minneapolis, MN. Deputy Sonenstahl learned that a person named Halimatul Saadiha Farah also listed her residence as 3036 Grand Ave. S., #302, Minneapolis, Minnesota.

Deputy Sonenstahl averred that the physical description, clothing, handgun, verbiage used, and vehicle used by Defendant matched descriptions of several other unsolved bank robberies. Based on the above, Deputy Sonenstahl sought a search warrant for the above-listed address. Deputy Sonenstahl also sought a nighttime search based on Defendant and Farah's intent to leave the United States the following day, January 4, 2012.

Based on the above-described affidavit, the court found probable cause existed to search Defendant's residence. The court also found that a nighttime search was appropriate given the residents' impending travel plans.

### 3. Search Warrant for Defendant's DNA

On January 19, 2012, Eden Prairie Police Detective James Lindgren applied for a search warrant for Defendant's DNA based on the following facts.

On April 26, 2011, at approximately 8:30 a.m., a white male dressed in black clothing robbed the United Educators Credit Union in Eden Prairie, Minnesota. The man concealed his face and carried a gun and an umbrella. The suspect stated, "This is a robbery." The suspect also asked for all the $100, $50, and $20 bills. The teller gave the suspect bills in these denominations, as well as a dye pack. The suspect fled with the money and his umbrella toward nearby businesses Discount Tire and KFC restaurant. Officers later found a black umbrella and several $100, $50, and $20 bills in the grass between Discount Tire and the entrance of KFC. Three of the $20 bills from the bank's dye-pack, given to the United Educators suspect, were located and identified. The Hennepin County Sheriff's Crime Lab processed the umbrella for DNA and retained a sample.

Also on April 26, 2011, there was an attempted robbery in Bloomington, Minnesota, at 9:13 a.m. and a robbery in Faribault, Minnesota, at 10:15 a.m. The description of the Bloomington and Faribault suspect matched that of the Eden Prairie suspect. Detective Lindgren averred that he was involved in the investigation of a series of bank robberies with similar *modus operandi*, which matched the details of the Rolling Hills robbery. Detective Lindgren described the vehicle used in the Rolling Hills robbery, including the year, make, model, license plate number, and contents.

Based on the above-mentioned facts, Detective Lindgren sought a warrant for Defendant's DNA, via buccal swab, to compare with the DNA found on the umbrella near the Discount Tire and KFC restaurant in Eden Prairie. A warrant for Defendant's DNA was issued.

### 4.      Search Warrant for Defendant's Cellular Telephone

Finally, the authorities sought and obtained a warrant to search a black Apple iPhone seized from a silver Ford Edge bearing Minnesota license plate 335EDC, with VIN number 2fmdk4kc1bba779356. In his affidavit in support of this warrant, Special Agent Mark Fredkove averred that on January 3, 2012, a man wearing a black mask, gray stocking hat, green coat, dark gloves, and blue jeans, entered Rolling Hills Bank and Trust at 11:39 a.m. The suspect brandished a small black revolver and demanded money. The teller placed United States currency in a bag produced by the suspect, including $100 of pre-recorded bait bills. The man ran out the front door of the bank.

Two witnesses observed a silver SUV leaving the bank, one of whom noted it was a lone, white male. At that time, a description of the man and the vehicle was broadcast to law enforcement. Agent Fredkove recounts the vehicle stop described above, as well as the search of the silver SUV. Included in the items recovered from the vehicle were the pre-recorded bait bills taken during the Rolling Hills robbery. Agent Fredkove also averred that Defendant waived his *Miranda* rights and admitted to having used his Apple iPhone to search for banks in southwest Minnesota that morning. Because certain telephones are capable of storing information, including internet browsing history and geographic locations, Agent Fredkove sought a warrant to search the subject telephone.

The Honorable Arthur J. Boylan, Chief United States Magistrate Judge, District of Minnesota, issued a warrant authorizing law enforcement to search the telephone for data related to the violation of 18 U.S.C. § 2113(a).

## II.     Summary of Defendant's Motions to Suppress

Defendant has filed two separate motions to suppress evidence. In his first motion, Defendant seeks to suppress the fruits of multiple searches, including the seizure of Defendant and the ensuing searches of his vehicle, residence, DNA, and Apple iPhone. In his second motion, Defendant seeks to suppress any statements given to law enforcement. Specifically, Defendant seeks to suppress the statements given during interviews at the Nicollet County Sheriff's Office and the Sherburne County Jail. The Court will address each issue in turn.

## III.    Motion to Suppress Fruits of Searches

### A.     Traffic Stop

Defendant challenges the validity of Detective Sandland and Officer Belgard's traffic stop on January 3, 2012. The starting point for any discussion of the legality of a search or seizure is the recognition that the Fourth Amendment bars "unreasonable searches and seizures" and guarantees "the right of the people to be secure in their persons, houses, papers, and effects." U.S. Const. amend. IV. It is with that bedrock principle that the Court begins its review.

It is well settled that police may initiate a vehicle stop if they have a "reasonable suspicion that the vehicle or its occupants are involved in criminal activity." *United States v. Coleman*, 603 F.3d 496, 499 (8th Cir. 2010) (citation omitted) ("Moreover, a vehicle stop is lawful based upon reasonable suspicion of criminal activity."); *United States v. Spotts*, 275 F.3d 714, 718 (8th Cir. 2002) (quoting *United States v. Bell*, 183 F.3d 746, 749 (8th Cir. 1999)). Indeed, the police must have a "reasonable suspicion that a crime has previously been committed

by an individual." *United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008) (citations

omitted). The suspicion must be supported by "specific and articulable facts." *Terry v. Ohio*, 392

U.S. 1, 21 (1968). A *Terry* stop allows an officer to "briefly stop an individual and make

reasonable inquiries aimed at confirming or dispelling the suspicion." *Hughes*, 517 F.3d at 1016

(citing *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)).

Importantly, reasonable suspicion may not be based on a mere "hunch." *Coleman*, 603

F.3d at 499 (citing *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004)). Indeed, officers

may not rely on "inchoate and unparticularized suspicion[s] or 'hunch[es].'" *Terry*, 392 U.S. at

27. Instead, "the Fourth Amendment . . . requires an officer to articulate 'some, minimal

objective justification for an investigatory stop.'" *Coleman*, 603 F.3d at 499-500 (quoting *Fuse*,

391 F.3d at 929)). Reasonable suspicion "requires a showing considerably less than

preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United

States v. Sokolow*, 490 U.S. 1, 7 (1989)). A police officer's reliance on "[f]actors consistent with

innocent travel" is acceptable if those innocent factors, "taken together," *United States v.

Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006), support an "objective basis for suspecting legal

wrongdoing," *United States v. Bailey*, 417 F.3d 873, 877 (8th Cir. 2005) (quoting *United States

v. Arvizu*, 534 U.S. 266, 273 (2002)). Likewise, an officer's inferences and deductions are

relevant to the determination of whether reasonable suspicion exists because officers are "trained

to cull significance from behavior that would appear innocent to the untrained observer." *United

States v. Poitier*, 818 F.2d 679 683 (8th Cir. 1987).

A court may focus its analysis "on the temporal and geographic proximity of the car to

the scene of the crime, the matching description of the vehicle, and the time of the stop." *See

United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998). Moreover, "[a]n officer may

rely on information provided by other officers and all of the information known to the team of officers involved in the investigation to provide justification for a stop." *United States v. Robinson*, 119 F.3d 663, 666-67 (8th Cir. 1997) (citing *United States v. O'Connell*, 841 F.2d 1408, 1418-19 (8th Cir. 1988)); *see also United States v. Allison*, 637 F. Supp. 2d 657, 664 (S.D. Iowa 2009) (citing *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999)) ("Police officers may rely on information from other officers in making a *Terry* stop."). The Court must consider the totality of the circumstances in reviewing a traffic stop for reasonable suspicion. *Arvizu*, 534 U.S. at 273 (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

The Court finds that Sandland and Belgard had reasonable suspicion to initiate a traffic stop of Defendant's vehicle. That reasonable suspicion is based on the following facts and circumstances. First, Detective Sandland was aware of a cluster of robberies, many of which had a similar *modus operandi*. There were some similarities between the cluster of robberies and both the Wells Federal and Rolling Hills robberies, including similarities between the vehicles and the use of a small black handgun. Second, based on the location of many of those robberies being in the Twin Cities metropolitan area, Detective Sandland believed the suspect would be traveling north from Brewster to the Twin Cities. Third, the Wells Federal robbery, which took place approximately two weeks prior to the Rolling Hills robbery, involved a light-colored SUV. While the witness was unable to confirm the make or model of the Wells Federal vehicle at first, after being shown a photograph of a Ford Edge, she confirmed that it was the same make and model as the one used in the Wells Federal robbery. While the defense questioned Detective Sandland regarding the approximate age of the witness who identified the color and type of vehicle used in the Wells Federal robbery, there is no evidence that she was an unreliable witness. Fourth, the Rolling Hills robbery involved a silver colored SUV.

Fifth, a report indicated that the silver SUV left the scene and proceeded northbound on Highway 60. Sixth, based on Detective Sandland's determination that the suspect was likely traveling to the Twin Cities, he plotted the most likely route. Founded on Detective Sandland's familiarity with the Minnesota highway system, he inferred that the suspect would likely follow Highway 60 to Route 169, which is the most direct route from Brewster to the Twin Cities. Sandland knew Route 169 passed through St. Peter. Having traveled from Worthington, Minnesota—a town adjacent to Brewster—to St. Peter, Detective Sandland calculated the approximate time when the suspect would be traveling through St. Peter on Route 169. Based on his experience, Sandland fixed that time as 1:10 p.m. to 1:20 p.m.

Seventh, because Sandland knew the original description of the Rolling Hills suspect was a black male, he looked into the discrepancy and learned the suspect was an unknown race male wearing a black mask. Sandland learned this information before initiating the traffic stop. Eighth, while Sandland was verifying the description of the suspect and before initiating the traffic stop, Sandland observed a light-silver Ford Edge traveling northbound on Route 169 at approximately 1:11 p.m. Sandland had not seen any other silver-colored SUVs in the timeframe during which he expected the suspect to travel through St. Peter. Ninth, Detective Sandland observed the driver of the silver Ford Edge SUV to be a lone white male wearing a black jacket. Sandland called ahead to Officer Belgard to have him verify the description of driver. Tenth, after beginning to follow the vehicle, Sandland verified the vehicle's registration as registered to PV Holding Company, a rental car company in Minneapolis. Eleventh, after Sandland began following the vehicle, but before he turned on his emergency lights, it slowed to approximately 20 m.p.h. The speed limit was 55 m.p.h.

The facts and circumstances recounted above were known to Detective Sandland before initiating the traffic stop and are sufficient to establish a reasonable suspicion that the vehicle was involved in the commission of a crime. While some of the individual facts or circumstances taken alone may not give rise to reasonable suspicion, the Court views the totality of the circumstances and finds ample evidence of reasonable suspicion. *Arvizu*, 534 U.S. at 273.

Defendant seeks to refute the veracity of the above-listed facts by attacking Detective Sandland's credibility. For example, Defendant argues other police departments provided the "fourth-hand" information on which Detective Sandland relied in part on the morning of January 3. Because Sandland received his information from other officers, rather than the original sources, Defendant argues the information is unreliable. On the contrary, reliance on that information is proper because Detective Sandland received the information from other officers who were working in a team. *See Robinson*, 119 F.3d at 666-67. Defendant also characterizes many of the facts and circumstances on which Detective Sandland relied as "hunches" or "mere beliefs," based on Sandland's testimony being "littered with the word(s) '*belief*' or '*I believed*' . . . [or] he *thought*." (Def. Br. Resp. to Aug. 27, 2012 Hr'g at 7, ECF No. 166 [hereinafter "Def. Br."] (emphasis in original).) A review of Detective Sandland's testimony reveals that Detective Sandland used the word "belief" one time and the words "I believed" two times when describing his justification for stopping Defendant's vehicle, one of which was in reference to the name of the entity to whom the vehicle was registered. But more importantly, merely saying the word "belief" or "believe" does not mean, as Defendant argues, Sandland was relying on a hunch. On the contrary, a review of the record indicates that Sandland's beliefs were conclusions founded on concrete facts relayed to him.

Defendant also argues that the teletype originally broadcast to law enforcement listed the suspect as a 6' 1" slender black man wearing a light blue jacket, possibly traveling northbound on Highway 60 in a small silver SUV. First, a variance of only a few inches does not negate reasonable suspicion. *See United States v. Gilliam*, 520 F.3d 844, 847 (8th Cir. 2008) (finding that a nine-inch difference in height did not remove a defendant from suspicion, given all the circumstances). Furthermore, with regard to racial discrepancy, prior to initiating the traffic stop, Detective Sandland verified the information. Viewed in the totality of the circumstances, and because Sandland confirmed the information *prior to* initiating the *Terry* stop, this discrepancy is irrelevant to the finding of reasonable suspicion.

Defendant also argues that, because he was 100 miles from the scene of the robbery, "there was nothing reasonably suspicious about his behavior or conduct." (Def. Br. at 7.) Again, Defendant's logic turns the issue on its head. The fact that a silver SUV was traveling northbound on Route 169 exactly when Detective Sandland expected it, based on a calculation of distance and miles per hour, weighs heavily in favor of finding reasonable suspicion. Defendant's argument that no witness specifically saw the bank robbery suspect enter or exit the suspect vehicle is unavailing, too. A witness observed the vehicle leaving the scene. While actually witnessing a man dressed in a black jacket enter or exit the vehicle would certainly elevate the suspicion further, such evidence is not necessary. It was reasonable to infer that the bank robbery suspect left the scene in the vehicle.

Next, Defendant seizes on discrepancies between Detective Sandland's testimony and his search warrant affidavit. (Pro Se Ex. List, Ex. A.5, ECF No. 178.) For example, Defendant asserts that Sandland's testimony that he verified the Rolling Hills suspect's race with the Worthington Police Department conflicts with his affidavit in which he avers he verified the

information with the Nobles County Sheriff's department. This conflict is immaterial and does not significantly affect Sandland's credibility. Defendant also focuses on Sandland's Supplementary Investigation Report ("SIR") in which Sandland states he contacted Worthington Police at 1:00 p.m. and the suspect drove past at 1:11 p.m. Defendant argues that Sandland testified that he was on the phone with Worthington dispatch at 1:11 p.m. when he saw the suspect vehicle, not at 1:00 p.m., eleven minutes earlier. It is entirely possible that Sandland was on the phone for eleven minutes, and it is possible that he was estimating exactly what time he telephoned to verify the information. In any event, this gap in time, especially as framed, is irrelevant to the reasonable suspicion determination. Finally, the discrepancy between the Wells Federal robbery witness who specifically remembered the suspect vehicle having a cargo rack and the absence of a cargo rack from Defendant's vehicle is not fatal to a finding that law enforcement had reasonable suspicion to conduct an investigatory stop of Defendant's vehicle. As Sandland testified at the hearing, the suspect vehicle had ridges on its roof that closely resembled a cargo rack. Accordingly, this minor difference does not affect the Court's decision.[8]

In light of the totality of the circumstances, the Court concludes Detective Sandland had reasonable suspicion to initiate a *Terry* stop of Defendant's vehicle.

**B.      Vehicle Searches**

After Defendant pulled his vehicle to the side of the road, Detective Sandland and Officer Belgard approached Defendant's vehicle. Sandland approached the driver's side and Belgard followed the passenger's side of the car. After asking Defendant to step out of the vehicle and a

---

[8] Defendant makes various other arguments in an attempt to discredit the testimony offered by Detective Sandland. The Court has considered those arguments and considers Detective Sandland to be a credible witness. Although tested rigorously on cross examination, his testimony was not overstated and it was consistent with other evidence, such as the ICOP video.

short discussion, Officer Belgard searched the vehicle. At some point after they transported Defendant from the scene of the investigatory stop, law enforcement obtained two search warrants for Defendant's vehicle. The Court will address the roadside search and the searches pursuant to a warrant separately.

### 1. Roadside Search[9]

The Government argues Detective Sandland and Officer Belgard executed a valid search of Defendant's vehicle pursuant to his consent. Defendant denies having given consent. Law enforcement may search a motor vehicle, even in the absence of a warrant or probable cause, if a person authorized to give consent does so. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Such consent is an exception to the Fourth Amendment's warrant requirement. *Id.* The Court considers the totality of the circumstances in determining whether consent is voluntary. *United States v. Gipp*, 147 F.3d 680, 685 (8th Cir. 1998). The burden of proving by a preponderance of the evidence that a search is consensual falls on the Government. *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004). In determining whether a suspect has voluntarily given consent, the Court considers various factors, including:

> personal characteristics of the defendant, such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of detention or questioning, the substance of any discussion between the defendant and police preceding the consent, whether the defendant was free to leave or was subject to restraint, and whether the defendant's contemporaneous reaction to the search was consistent with consent.

*United States v. Jones*, 254 F.3d 692, 696 (8th Cir. 2001) (citing *United States v. Hathcock*, 103 F.3d 715, 719-20 (8th Cir. 1997)). The question of voluntariness does not depend exclusively on

---

[9] The Government does not argue it had probable cause to search Defendant's vehicle. Accordingly, the Court will consider only whether Defendant validly consented to the warrantless search.

whether law enforcement advised a suspect that he could withhold his consent. *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996) (citation omitted.) ("[S]o too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary."); *Schneckloth*, 412 U.S. at 227 ("[T]he government need not establish such knowledge as the *sine qua non* of an effective consent."); *see also United States v. Drayton*, 536 U.S. 194, 206 (2002) (acknowledging the that the Supreme Court "has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search."); *United States v. Siwek*, 453 F.3d 1079, 1084 (8th Cir. 2006) (citation omitted). Nor is law enforcement categorically obligated to provide a suspect with a consent-to-search form. *See Siwek*, 453 F.3d at 1084 (citing *United States v. Carrate*, 122 F.3d 666, 670 (8th Cir. 1997)). The paramount inquiry in determining whether consent is freely and voluntarily given, however is "whether, in light of the totality of the circumstances, consent was given without coercion, express or implied." *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005) (citing *Schneckloth*, 412 U.S. at 227)). With regard to plain-view searches, however, neither consent nor a warrant is necessary. *See United States v. Hill*, Crim. No. 11-cr-0015 (DWF/LIB), 2011 WL 1486023, at *8 (D. Minn. Mar. 31, 2011) (discussing plain-view searches in the absence of clear consent).

The Court's careful review of the videotaped traffic stop in combination with Detective Sandland's credible testimony clearly indicates Defendant voluntarily consented to the search of his vehicle. Sandland asked Defendant whether he had a problem with them searching his car, and Defendant responded by saying "No" multiple times, signaling he did not have a problem. Further, Officer Belgard then asked Defendant for consent to search his vehicle. According to Belgard, Defendant responded that he did not mind or at least nodded to Belgard. Thus,

Defendant's reactions gave Officer Belgard every reason to believe he had consent to search the vehicle.

Furthermore, in considering the totality of the circumstances, the Court notes that Defendant is an intelligent man, with a bachelor's degree in nursing. While both Detective Sandland and Officer Belgard noted Defendant's hands were shaking, Defendant appeared sober and lucid throughout the very brief period during which Sandland explained the situation. Neither officer had his gun drawn, nor did either officer act aggressively toward Defendant. Fewer than three minutes elapsed between the time that Defendant was removed from his car and the car was searched, and at no point did either officer threaten or attempt to coerce Defendant. Detective Sandland was open and honest about his justification for initiating the traffic stop, advising Defendant that he and his vehicle matched the description of a bank robbery suspect. Further, Defendant openly and freely answered the questions posed by Detective Sandland, including where he was coming from and whether there were any guns or knives in the vehicle. Further, while this information was unknown to Sandland at the time, Defendant had experience with law enforcement previously, which weighs in favor of finding his consent voluntary.

Most telling, however, is the way in which Defendant reacted to Officer Belgard opening the vehicle door. Defendant remained quiet. The video clearly portrays Defendant walking toward the passenger side of the vehicle and watching as Officer Belgard leans into the car and looks inside. That "contemporaneous reaction" is clearly consistent with the testimony that Defendant gave his consent voluntarily and never withdrew his consent.

Defendant offers various bases for finding a lack of consent or, in the alternative, lack of voluntary consent. First, Defendant argues that the officers' questions were vague and that he understood them to be asking whether they could look in his vehicle through the windows. This

argument is unavailing. Defendant did not withdraw his consent when he saw Belgard open the door, and the fact that Belgard was conducting a plain-view search through the windows of the vehicle throughout the duration of the stop should have indicated to Defendant the officers were not seeking consent to simply continue looking through the vehicle's windows.

Second, Defendant argues that, because the words "search" or "permission" were not used, his consent was not voluntary. This argument, too, is insufficient. *See United States v. Grant*, 375 Fed. App'x 79, 80 (2d Cir. 2010) (quotation omitted) ("Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'").

Third, Defendant argues police procedure requires the presentation of a modified consent-to-search warning. On the contrary, such a written warning has been specifically rejected by the Supreme Court as a prerequisite for a finding of voluntary consent to search. *See Robinette*, 519 U.S. at 39-40; *Drayton*, 536 U.S. at 206. Whether police department procedures required the offering of a consent-to-search form is of no concern to the Court; rather, the Supreme Court's precedent that such a form is unnecessary is binding on the Court.

At bottom, there is no indication whatsoever that Defendant was coerced into giving his consent to search his vehicle. Under the totality of the circumstances, it is clear to the Court that Defendant voluntarily gave his consent to search the interior space of his vehicle, and he never withdrew his consent. Accordingly, the fruits of the vehicle search should not be suppressed.

### 2.     Search Warrants: Probable Cause

At some point following Defendant's detention and subsequent questioning at the Nicollet County Sheriff's Office, law enforcement obtained two search warrants. The first warrant was obtained on January 3, 2012, and the second was obtained on January 4, 2012. The

warrants were submitted as one exhibit, Government Exhibit 1, with some corrections. The January 3 warrant application describes the vehicle as a "2010 Ford Escape, silver in color with Minnesota registration 335 EDC." The January 4 warrant application describes the vehicle as a "2011 Ford Edge, silver in color with Minnesota registration 335 EDC VIN # 2fmdk4kc1bba779356." The second warrant application submitted as part of Government Exhibit 1 did not include a separate affidavit. It is clear to the Court that the warrant applications, submitted into evidence together, relied on the same affidavit and Exhibit 1 will be addressed as a whole.

A search warrant "must be supported by a showing of probable cause." *United States v. Summage*, 481 F.3d 1075, 1077 (8th Cir. 2007). In assessing whether a warrant was properly issued, the Court must determine "whether the application and affidavit established," *United States v. Stevens*, 439 F.3d 983, 987-88 (8th Cir. 2006), the practical, common-sense conclusion that the totality of circumstances created "a fair probability that contraband or evidence of a crime will be found in a particular place," *Illinois v. Gates*, 462 U.S. 213, 238 (1983). *See also United States v. Lynch*, 322 F.3d 1016, 1017 (8th Cir. 2003) ("The information presented in the application for the search warrant and in Officer Furness's accompanying affidavit clearly establish probable cause for the search of the entire property."); *United States v. Ryan*, 293 F.3d 1059, 1061 (8th Cir. 2002) (quoting *United States v. Goodson*, 165 F.3d 610, 613 (8th Cir. 1999) ("Search warrant applications and affidavits should be read with common sense and not in a grudging, hyper technical fashion." (internal quotation marks and alterations omitted)). *But see United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citation omitted) ("When the issuing judge relied solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in

determining the existence of probable cause." (internal quotations and alterations omitted)). In reviewing the warrant applications for probable cause, the Court is mindful that "[t]echnical requirements of elaborate specificity once exacted under common law have no proper place in this area." *Gates*, 462 U.S. at 235 (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)); *see also United States v. Hyten*, 5 F.3d 1154, 1157 (8th Cir. 1993) (finding probable cause to search two residences, despite the inadvertent omission of the address of one residence, because that affidavit referred to omitted home).

The Court is obligated to "give considerable deference to the issuing judge's determination of probable cause." *United States v. Dishman*, 377 F.3d 809, 811 (8th Cir. 2004). Included in the deference to the issuing judge is the understanding that the issuing judge "may properly rely on normal inferences drawn by the surrounding circumstances and allegations of fact contained in the affidavit." *United States v. Carlson*, 697 F.2d 231, 238 (8th Cir. 1983) (quoting *United States v. Leichtling*, 684 F.2d 553, 556 (8th Cir. 1982)). The standard of review employed when reviewing the issuance of a search warrant is *not* de novo. *Gates*, 462 U.S. at 236. Instead, the Court considers whether the issuing judge, in light of the totality of the circumstances, "had a *substantial basis* for concluding that a search would uncover evidence of wrongdoing." *Id.* at 230, 236 (emphasis added). Incorrect information that is negligently or innocently included does not automatically void a finding a probable cause. *See United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).

The Court need not recount each detail of the warrant applications, as the facts are recounted above. The Court finds that the warrant applications, including the supporting affidavits, are sufficient to establish probable cause that Defendant's vehicle and its contents had

potential evidentiary value. The facts most relevant to this determination are that, following a consent-search of the vehicle, law enforcement found a large amount of loose United States currency and the grip of a handgun. Further, that evidence was found in a silver SUV matching the description of the vehicle leaving the scene of the Rolling Hills robbery and traveling in the same direction. The Court does not rely whatsoever on the portion of the affidavit that mentions Defendant's Nicollet County confession.

While the full description of the vehicle was not set forth in the affidavit, it is evident that the silver-colored SUV to be searched was the one in which Defendant was stopped. Also, the attached applications contained more specific descriptions of the vehicle. While the applications inconsistently identified the vehicle as a "2010 Ford Escape" and then a "2011 Ford Edge," the make, license plate, and color were identical in both applications, and those facts were consistent with the affidavit. The January 3 affidavit states that the Rolling Hills robbery took place on "January 3rd, 2011," when the Rolling Hills robbery actually took place on January 3, 2012.

The Court does not find these mistakes fatal. Probable cause is not perfection. The Court evaluates the warrant application and affidavit as a whole and must avoid a hyper-technical reading of the application and affidavit. Here, the applications and affidavit establish probable cause that the car driven by Defendant, a silver Ford SUV with Minnesota license plate number 335-EDC, contained contraband or other evidence of a bank robbery. Moreover, mistaking the date in the early days of a new year does not destroy this probable cause, nor does mistaking one model of SUV made by Ford for another—Escape versus Edge. Rather, the significant facts supporting probable cause explain how the robbery occurred, the description of the vehicle seen leaving the scene, the direction the vehicle was traveling, and the fact that, despite Defendants' statement to the contrary, there was a firearm found in his vehicle. In this case, the officers did

the proper thing the next day in taking corrective action by giving a more accurate vehicle identification to the issuing judge, who signed both warrants.

Accordingly, based on its review of the search warrant application, the Court concludes that the issuing judge had a substantial basis for finding probable cause and issuing the January 3 and January 4 warrants.[10]

### 3.    Search Warrants: Good Faith Exception

In the alternative, the Court concludes that the police acted in objective good faith when executing the vehicle warrants. The good-faith exception to the warrant requirement counsels against suppression of evidence "seized pursuant to a search warrant that lacked probable cause . . . if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008) (citation omitted). The Supreme Court has held that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *United States v. Leon*, 468 U.S. 897, 922 (1984). When considering the application of the good-faith exception, the Court considers "whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (quotation omitted).

There are four instances in which the officer's reliance would be unreasonable, including:

_____

[10] The Court would be remiss if it did not take this opportunity to point out that the warrant application was far from perfect. The Government would have been wise to address these issues specifically. Nonetheless, "[I]n dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gates*, 462 U.S. at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)) (internal quotation marks omitted).

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*"; and (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id.* at 431 (emphasis in *Proell*) (citing *Leon*, 468 U.S. at 923).

Here, the officers reasonably relied on two warrants. The officers presented the applications, and a duly authorized judge issued the vehicle search warrants. The officers reasonably relied on the January 3 warrant, even though it had the incorrect model and year. *See, e.g., United States v. Thomas*, 263 F.3d 805, 806 (8th Cir. 2001) (applying the good-faith exception where the warrant at issue included the incorrect home address).[11] Further, despite the failure to include the vehicle information in the body of the affidavit, the inclusion of the vehicle information in the applications cures that failure. *See, e.g., United States v. Guzman*, 507 F.3d 681, 685-86 (8th Cir. 2007) (applying the good-faith exception where affidavit was deficient

---

[11] The court in *Thomas* observed:

> The fact that the warrant here contained an incorrect address, thus increasing the likelihood of searching the incorrect residence, does give us pause. However, this increased danger was mitigated not only by the fact that Officer Harris, who had personal knowledge of the location to be searched, both obtained and executed the warrant, but also by the fact that the intended location was under surveillance while he secured the warrant. *See Gitcho*, 601 F.2d at 372 (upholding search because, although warrant contained slightly incorrect address, agent executing warrant personally knew which premises to search and premises were under constant surveillance while warrant was obtained).

*Id.* at 809.

Similarly, law enforcement knew exactly which vehicle was to be searched, and it was seized and sealed after transporting Defendant to be interviewed.

because presenting officer offered additional documentary information to judge before warrant was issued).

There is no evidence that the affidavit on which the issuing judge relied contained knowingly false statements. It is not as if the officers were scouring Nicollet County looking for a vehicle to search. The reality is the vehicle was sealed at the crime scene and sitting in police custody after Defendant's arrest. In haste, the officers rushed to obtain a warrant and inadvertently included the incorrect vehicle model, year, and year of the robbery. But importantly, the warrants contained an accurate and consistent license plate number, which is the license plate number of the vehicle that was actually searched. The second application did not contain any incorrect vehicle information.

Likewise, there is no indication whatsoever that any of the other three circumstances that would otherwise render the good-faith exception inapplicable are present. There is no evidence that the issuing judge "wholly abandoned his judicial role" in issuing the warrant. Moreover, even if the warrants lacked probable cause, the Court finds that the affidavits are not *so lacking* in indicia of probable cause to render belief in the existence or probable cause even mildly unreasonable, much less entirely unreasonable. Finally, the warrants are not facially deficient, and reliance on them was reasonable.

It is well-settled that "[t]he primary justification for the exclusionary rule then is the deterrence of police conduct that violates Fourth Amendment rights." *Stone v. Powell*, 428 U.S. 465, 486 (1976). The exclusionary rule focuses on "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144 (2009). Negligent conduct, such as that at issue here, that is simple or isolated

does not justify the exclusion of evidence. *Davis v. United States*, 131 S. Ct. 2419, 2427-28 (2011). None of the officers' actions here rise to a level requiring suppression.

Therefore, even if the warrants lack probable cause, this is an appropriate situation in which to apply the good-faith exception to the Fourth Amendment warrant requirement.

### C.     Residential, DNA, and Apple iPhone Search

The Court now switches its focus to the remaining search warrants: for Defendant's residence (Gov't Ex. 2), Defendant's DNA (Gov't Ex. 3), and an Apple iPhone (Gov't Ex. 4). The Court considers these exhibits together because each search warrant application relies on largely the same nucleus of facts and circumstances. Thus, consideration of the warrants together is acceptable.[12]

The Court has carefully reviewed each warrant and finds that each issuing judge had a substantial basis to find probable cause. For example, the following facts supporting probable cause are present in each of the three remaining affidavits in support of the respective search warrant applications: a robbery occurred at Rolling Hills on January 3, 2012; law enforcement initiated a traffic stop of a silver Ford Edge bearing Minnesota license plate number 335-EDC while Defendant was driving the vehicle; a consent search yielded, among other things, a toy black gun and a large amount of United States currency.

Then, with regard to the residential search warrant, the affidavit makes clear there was reason to believe evidence associated with this and other robberies committed in the Twin Cities matching the same *modus operandi* as the Rolling Hills robbery would be recovered.

---

[12] Defendant argues that the warrants were "issued in error by the United States Magistrate Judge." (Def. Br. at 23.) Only one of the warrants submitted to the Court was issued by a United States Magistrate Judge. Affording Defendant a liberal reading of his submissions, however, the Court applies his arguments to the issuance of all the warrants, not solely the federally-issued warrant.

Specifically, the clothing, verbiage, physical appearance of the suspect, and a unique handgun were the same as previous robberies. Law enforcement sought to search Defendant's residence for evidence of other bank robberies matching the Rolling Hills *modus operandi*. These extra facts only add to the foundation of probable cause.

Next, regarding the warrant authorizing a buccal swab based on evidence recovered from another robbery on April 26, 2011, the affidavit establishes that the *modus operandi* of the April 26 suspect matched that of the Rolling Hills robbery. There, the suspect carried an umbrella. The suspect fled toward a nearby Discount Tire and KFC restaurant, where an umbrella and some cash was later recovered by the Eden Prairie Police Department. Based on those facts, it was reasonable to assume that DNA found on the umbrella may match Defendant's DNA, who they suspected had committed both robberies.

Finally, the FBI sought a search warrant for Defendant's Apple iPhone based on his statement in Sherburne County that he used his telephone to search for banks to rob before finding the Rolling Hills bank in Brewster. Further, the warrant affidavit avers that this type of device may store relevant information including text messages, emails, incoming and outgoing telephone calls, and sometimes internet browsing history and geographic location information. Accordingly, it was reasonable to conclude that information regarding the Rolling Hills robbery would be found on the phone.

Thus, none of the warrants lack probable cause and the Court recommends the motion to suppress be denied.

**D.      Conclusion**

Considering all the video and testimonial evidence, it is clear to the Court that the traffic stop was well within the bounds of a constitutional *Terry* stop. Further, the Court finds that Defendant freely and voluntarily gave his consent to have his vehicle searched.

In addition, the warrants obtained by law enforcement were supported by probable cause. Even if the issuing judge did not have a substantial basis to find probable cause as to the vehicle, the Court finds that the good-faith exception applies. Therefore, the Court recommends that Defendant's motion to suppress evidence obtained as a result of searches and seizures (ECF No. 47) be denied.

**IV.     Motion to Suppress Statements**

Defendant seeks to suppress statements and admissions made at the Nicollet County Sheriff's Office and the Sherburne County Jail. Specifically, Defendant asserts his statements were made without the benefit of counsel, in violation of the Fifth Amendment and Sixth Amendment. Defendant also asserts the statements were not freely and voluntarily given, in violation of the Fourth and Fifth Amendments. Finally, Defendant argues that, because his arrest was unlawful, any statements should be excluded under the Fourth Amendment as fruit of the poisonous tree.

The first inquiry requires the Court to examine the totality of the circumstances surrounding Defendant's interrogation to determine whether the statements were given freely and voluntarily, in accordance with due process. *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quotations omitted). In evaluating the coercive nature of an interrogation and the voluntariness of a statement, the Court may consider a litany of factors that comprise the "totality of the circumstances." *United States v. Grant*, 622 F.2d 308, 316-17 (8th Cir. 1980) (citations

omitted). The court in *Grant* recited the well-known requirements that courts consider whether the confession was "extracted by any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the exertion of any improper influence." *Id*. at 316 (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)) (parentheses in original). The court went on to note that "[w]hile the *Bram* test has long been followed, it has not been interpreted to be applied on a strict, per se basis." *Id.* (collecting cases). Citing subsequent Supreme Court precedent, the court determined that the voluntariness assessment is "based upon . . . all of the circumstances and factors surrounding the occurrence when the statement is made." *Id.*

Those factors fall into two categories: the conduct of the officers and the characteristics of the suspect. *See United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (citing *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 952 (8th Cir. 2001)). Included in those factors are, *inter alia*, considerations like the location of the questioning, the suspect's age, whether the suspect was advised of his *Miranda* rights, and the suspect's experience with the criminal justice system.[13] A statement is involuntarily given if it is "extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001).

The Fifth and Sixth Amendments independently afford suspects the right to counsel. *See McNeil v. Wisconsin*, 501 U.S. 171, 175-78 (1991) (discussing difference between Fifth Amendment and Sixth Amendment rights to counsel). For the purposes of this motion, the Court

---

[13] *See United States v. Glauning*, 211 F.3d 1085, 1087 (8th Cir. 2000) (location of questioning); *United States v. Contreras*, 372 F.3d 974, 977 (8th Cir. 2004) (age of suspect); *United States v. Sawyer*, 588 F.3d 548, 554-55 (8th Cir. 2009) (administration of *Miranda* warning); *United States v. Muhlenbruch*, 634 F.3d 987, 998 (8th Cir. 2011) (experience with the criminal justice system).

is concerned with the Fifth Amendment right to counsel because the Sixth Amendment right to counsel does not attach until the institution of formal adversarial proceedings. *Id.* at 175 (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984) ("[The Sixth Amendment right] does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'")). Because the statements at issue here were given before any formal institution of criminal proceedings, the Fifth Amendment provides the basis for any suppression of Defendant's statements.

The Fifth Amendment privilege against self-incrimination requires that a suspect, once taken into police custody, receive a prophylactic *Miranda* warning before police interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The suspect must be advised that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* There is no dispute that Defendant was advised of his *Miranda* rights, both at Nicollet County and Sherburne County. Rather, the issues are whether Defendant waived his rights to remain silent and to counsel and, if so, whether he properly invoked his right to counsel at some point later.

Pursuant to the *Miranda* right to counsel, "[o]nce a suspect asserts the right, not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him.'" *McNeil*, 501 U.S. at 176-77 (quoting *Edwards v. Arizona*, 451 U.S. 477 484-85 (1981)). It is well-settled that "if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458 (1994) (citing *Edwards*, 451 U.S. at 484-85). Two primary issues are presented in

determining the admissibility of Defendant's admissions: waiver and invocation of his right to counsel. *See Smith v. Illinois*, 469 U.S. 91, 98 (1984) ("Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together."). Importantly, the Court in *Smith* held that "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself. Such subsequent statements are relevant only to the distinct question of waiver." *Id.* at 100 (emphasis in original).

A suspect in custody may waive his rights, and the Government must prove such a waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). To be effective, "a waiver must at a minimum be 'voluntary'. . . ." *Id.* at 169 (citing *Miranda*, 384 U.S. at 444). Where a suspect is advised of, and understands, his rights under *Miranda* and responds to questions without explicitly waiving his rights, affirmative responses constitute waiver of the right to remain silent. *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2262-63 (2010).

In evaluating a suspect's waiver, the Court considers the totality of the circumstances surrounding the waiver. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Fare v. Michael C.*, 442 U.S. 707, 726-27 (1979). The Court considers factors such as the suspect's intelligence and education, age, familiarity with the criminal justice system, and the explicitness of the waiver.[14] *See* 41 Geo. L.J. Ann. Rev. Crim. Proc. 199-201 (2012) (citing numerous cases considering the above-mentioned factors).

Once a court has found a valid waiver, it must conduct a two-part inquiry in determining whether *Edwards* requires suppression of a statement due to a suspect's subsequent invocation of

---

[14] *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (considering intelligence and education and experience with criminal justice system); *Contreras*, 372 F.3d at 978; *United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991) (acknowledging the Supreme Court's rejection of the requirement of an explicit waiver of *Miranda*).

his right to counsel. First, the Court must "determine whether the accused actually invoked his right to counsel." *Smith*, 469 U.S. at 95 (citing *Edwards*, 451 U.S. at 484-85). If a suspect validly invoked his right to counsel, the Court "may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Id.* (citing *Edwards*, 451 at 485, 486 n.9).

The clarity with which a detained suspect must request counsel is paramount in determining whether Defendant invoked his right to have the assistance of counsel. The "invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Dormire v. Wilkinson*, 249 F.3d 801, 804 (8th Cir. 2001) (quoting *Davis*, 512 U.S. at 459). The Court in *Davis* went on to require a suspect to "unambiguously request counsel." *Davis*, 512 U.S. at 459. Indeed, "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461-62. While clarifying ambiguous statements *is* good policy, *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003), the Supreme Court explicitly "decline[d] to adopt a rule requiring officers to ask clarifying questions," *Davis*, 512 U.S. at 461. The Court noted its unwillingness to "create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue." *Id.* at 462 (emphasis in original). The Court considers Defendant's statements "as a whole" when determining whether he has unequivocally invoked his *Miranda* rights. *Simmons*, 235 F.3d at 1131.

Included in the inquiry of clear and unequivocal invocation is the question of whether the suspect limited his invocation to specific terms. *See Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) (finding a limited invocation of the right to counsel effective where suspect refused to

make a written statement but freely gave oral statement). A court may still admit statements made after a conditional invocation of the right to counsel, so long as the statements fall outside the conditions delineated by the suspect. *See United States v. Jacobs*, 97 F.3d 275, 280 (8th Cir. 1996); *United States v. Boyer*, 914 F.2d 144, 146 (8th Cir. 1990). In determining the contours of the conditions under which a suspect will speak without counsel, the Court must give effect to the "ordinary meaning" of the words used to limit the invocation. *Barrett*, 479 U.S. at 529-30 (quoting *Michigan v. Jackson*, 475 U.S. 625, 633 (1986)) (determining that, even though courts are obliged to "give a broad, rather than a narrow, interpretation to a defendant's request for counsel," courts need not "disregard [] the ordinary meaning" of an invocation).

Defendant also relies on the Fourth Amendment, which counsels that any statement given while in unlawful custody is fruit of the illegal custody. *See Dunaway v. New York*, 442 U.S. 200, 217 (1979) (citing *Brown v. Illinois*, 422 U.S. 590, 604 (1975)) (finding the "voluntariness" inquiry associated with the Fifth Amendment to be a "'threshold requirement' for Fourth Amendment analysis"). It is well-settled that "statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." *United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002) (citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)). Accordingly, the Court must determine whether Defendant was properly in custody when he gave his statements. Law enforcement may conduct a warrantless arrest if, among other reasons, the police officer has probable cause to believe the arrestee committed a felony and the arrest occurs in a public place. *United States v. Jones*, 535 F.3d 886, 890 (8th Cir. 2008) (affirming a warrantless arrest where officer saw defendant in vicinity of a bank shortly after the bank robbery and defendant matched the suspect's description).

## A. Custody

The Court finds that Defendant was properly in custody following his roadside detention. It is not necessary to dwell on the question of whether the authorities had probable cause to arrest Defendant for long, because the decision is clear-cut. Taking the facts supporting a finding of reasonable suspicion to stop Defendant's vehicle, recounted in Part III.A, *supra*, and compounding those facts with the discovery of a large amount of loose United States currency and the handle of a handgun in Defendant's car, the Court finds the authorities had probable cause to arrest Defendant without a warrant in a public place. Defendant's vehicle matched the description of the suspect vehicle, Defendant largely matched the description of the suspect, and upon a consent search of his vehicle, law enforcement discovered fruits of the crime—money and a gun— in the car's center console. These facts, along with the other facts supporting the finding of reasonable suspicion, establish probable cause. Because Defendant was lawfully under arrest, the Fourth Amendment does not support suppression of Defendant's statements or admissions at either Nicollet County or Sherburne County.

## B. Nicollet County Statement

While in custody at the Nicollet County Sheriff's Office, Defendant gave a statement to Agent Helms, Agent Moule, and Detective Sandland. The Court must determine whether Defendant's statement was voluntary, whether he waived his *Miranda* rights, and if, after any waiver, Defendant validly invoked his rights. If any part of the interview violated Defendant's rights, the Court will turn to a discussion of the appropriate remedy.

### 1.    Voluntariness

The Court finds that Defendant's statement was given freely and voluntarily and was not violative of due process. In looking at the totality of the circumstances, the Court is firmly convinced that Defendant was speaking voluntarily in the traditional due process sense.

In considering the individual factors listed above, all but one—the location of the interrogation—weigh in favor of voluntariness. Defendant was not so unreasonably young that his will could be easily overborne. *See Contreras*, 372 F.3d at 977 (finding an 18-year-old sufficiently old enough to voluntarily consent). Further, Defendant was immediately advised of his *Miranda* rights, and he clearly understood the rights afforded him. Likewise, Defendant has experience with the federal criminal justice system. With the exception of the interrogation taking place at the "stationhouse," the factors outlined above counsel strongly in favor of finding Defendant's confession voluntary.

Most importantly, however, from the Court's review of the video, it is eminently clear that Defendant was acting voluntarily. Defendant exhibited no outward expressions of nervousness. He sat quietly, contemplated his responses to questions from Agent Helms, and made several requests throughout the interrogation. Moreover, it is clear that one of Defendant's chief concerns was being taken to Sherburne County and into federal custody. Within moments of Agent Helms speaking to Defendant in the back of Officer Belgard's squad car, Defendant suggested he would prefer to be in "fed custody." Throughout his interrogation at Nicollet County, he reiterated his interest in getting to Sherburne County, involving an FBI agent from Minneapolis, Dave Kukura, and even referencing his interest in "probably" talking to a federal public defender. Sure enough, Defendant was transported to Sherburne County. Defendant was in control of the interrogation, and there is no question his confession was voluntarily given.

Defendant argues briefly that Agent Helms used an implied promise: that if Defendant confessed, he would be transported to Sherburne County. The Court disagrees. Helms was responding to *Defendant's* requests to be taken to Sherburne County. In doing so, Helms was required to explain the difficulties of transferring a criminal suspect from one county jail to another in the absence of criminal charges justifying the transfer. Helms merely explained that, while it would be difficult to acquiesce to Defendant's request, the stronger the evidence against him, the more likely the case would become federal and Defendant would be detained in Sherburne County. Indeed, Helms recounted the progress of the *entire* investigation, including the pending search warrants, the matching of the bait bills, and other facts that would strengthen the case against Defendant, and informed Defendant that the case would likely be federal regardless of whether he confessed.

### 2. Waiver

Next, in addressing the issue of whether Defendant adequately waived his *Miranda* rights, the Court concludes he did. There is no dispute that Defendant refused to sign the FD-395 acknowledging he had been read his rights and understood them. Failure to sign a written waiver, however, does not render a waiver ineffective. *See United States v. Washington*, 109 F.3d 459, 465 (8th Cir. 1997) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)) (concluding that the "refusal to sign a waiver form not dispositive"). Instead, the Eighth Circuit has regularly held that a custodial defendant's continued responses to question after being advised of his rights constitutes a waiver. *E.g.*, *United States v. Binion*, 570 F.3d 1034, 1041 (8th Cir. 2009) ("Since Binion had been informed of his rights and had neither invoked his Fifth Amendment privilege nor requested an attorney, his decision to volunteer an incriminating response was an intelligent waiver of that right."); *see also House*, 939 F.2d at 662. Further, the Court considers the general

trajectory of the interrogation, which tends to support a finding that Defendant waived his rights. *See Smith*, 469 U.S. at 100 (finding "subsequent statements are relevant . . . to the distinct question of waiver").

When presented with the FD-395 and asked whether he desired to waive his rights, Defendant equivocated on what he wished to do, stating he wanted to "probably" talk to an attorney, but he was not sure if he would rather speak to an attorney first or with Agent Helms. In an effort to clarify, Helms indicated that Defendant could proceed and "pick and choose" which questions he wanted to answer. Defendant's next statement was that he would "like to talk to [Helms], you know. Like I said in the car, I'd rather be up in Minneapolis talking to you." The two continued to discuss Defendant's desire to be transported to Sherburne County and his desire to include Agent Kukura for a short while.

In reviewing the factors set forth above for determining whether a custodial suspect has waived his *Miranda* rights, the Court concludes the factors weigh in favor of finding a waiver. As previously noted, Defendant is very intelligent and has a bachelor's degree. He was articulate and appropriately responsive throughout the interview. Defendant's age is also a factor in support of finding waiver. He is not so old or so young as to find an inability to knowingly, intelligently, and voluntarily understand or waive his rights. Moreover, Defendant's familiarity with the criminal justice system was significant, having been prosecuted and convicted of a federal crime in the past. As for the explicitness of the waiver, the Court finds this factor neutral because, when Defendant responded to Helms's questions regarding continuing the interview, Defendant typically couched his answer in terms of wanting to continue the discussion with some caveats. The caveats Defendant offered —mainly that he would prefer to continue the

discussion in Minneapolis—are insufficient to outweigh the other factors that counsel in favor of finding his continued responses to questions a valid waiver of his *Miranda* rights.

### 3. Invocation

However, the Court must also consider whether Defendant's responses constituted an invocation of his rights. For a suspect's invocation of rights to be effective, it must be unequivocal. *Davis*, 512 U.S. at 461-62. The justification for the requirement of a clear invocation is to relieve law enforcement of the duty to decipher ambiguous acts, omissions, or statements and "face the consequence of suppression 'if they guess wrong.'" *Berghuis*, 130 S. Ct. at 2260 (citing *Davis*, 512 U.S. at 461). While the Court may not consider subsequent responses to interrogation, *Smith*, 469 U.S. at 99, consideration of the potential invocation "as a whole" is appropriate, *Simmons*, 235 F.3d at 1131.

The first of Defendant's potential invocations occurred a few minutes into his first interview immediately after Agent Helms went through Form FD-395. Defendant replied:

> Well, I, you know I want to probably talk to an attorney, it's just a matter of do I want to talk to you before I talk to the attorney . . . . If I talk to you you're going to ask me questions, you're going to ask me if I was involved and other questions as well.

This is not a clear and unequivocal invocation of Defendant's rights. *See United States v. Cloud*, 594 F.3d 1042, 1046 (8th Cir. 2010) (finding "Yeah. Probably," and "No, I just want to get my money and leave" ambiguous responses to the question of whether suspect wanted the assistance of counsel). Not only does Defendant equivocate, using the word "probably" before any interruption, Defendant went on to suggest he was considering discussing the matter with Agent Helms before speaking with an attorney. The Court concludes this potential invocation was not sufficiently specific to validly invoke Defendant's right to counsel.

Defendant's second potential invocation came approximately twenty minutes into his interview when Defendant said, "I mean, I probably should talk to a public defender, a federal public defender." That statement of fact is not an indication that Defendant *wanted* to talk to an attorney. This equivocal response is exactly what courts have found insufficient to invoke his right to counsel. A statement that Defendant should "probably" talk to an attorney does not indicate an actual, current desire to talk to an attorney. Defendant's statement that he "probably" should speak with a public defender is akin to the *Davis* defendant's statement, where he said, "Maybe I should talk to a lawyer." *Davis*, 512 U.S. at 455, 462. The word "probably" is in itself uncertain, and it is similar to the word "maybe." Further, when Agent Helms acknowledged that it was Defendant's right to speak with an attorney, Defendant still failed to state a present desire to actually speak with cousnel. Accordingly, this ambiguous invocation also lacks the required degree of specificity to constitute an invocation of Defendant's right to counsel.

Finally, approximately twenty-two minutes into his interview, Defendant stated, "I mean, if you can get me to Sherburne County today, I'll talk with you and Dave, otherwise I'm just inclined to plead the Fifth now until I talk to an attorney." This statement presents a closer call, which requires viewing the video to understand fully.

In the Court's view, the word "inclined" can be more or less equivocal, depending on context and tone. Defendant's tone turns more definitive at this point. Thus, the Court concludes that this statement constituted a *limited* invocation of Defendant's right to be represented by counsel before continuing his interview. Defendant stated his conditions of continuing the interview as a choice between continuing with Agents Helms and Kukura in Sherburne County, or terminating the interview at Nicollet County until he spoke with an attorney. At that point, the interview should have been terminated or moved to Sherburne County.

While the facts of this case differ from the facts of *Connecticut v. Barrett* and *United States v. Boyer*, the principles of those cases are readily applicable here. In *Barrett*, the defendant indicated he would be willing to make a statement but was unwilling "to put anything in writing until his attorney came." *Barrett*, 479 U.S. at 526. The Court found "no constitutional objective that would be served by suppression in th[at] case." *Id.* at 529. The Court reasoned that Defendant unambiguously wanted the assistance of counsel before making a *written* statement, and his limited invocation was valid and limited to its terms. *Id.* at 529-30.

Similarly, in *Boyer*, the defendant agreed to make a statement but said he "wanted to talk to an attorney before he would make a tape-recorded telephone call to the person that sent him the package." *Boyer*, 914 F.2d at 145. Relying on *Barrett*, the Eighth Circuit held that the "ordinary meaning" of the defendant's request for counsel applied "only to making a tape-recorded telephone call." *Id.* at 146.

Likewise, here, Defendant set the parameters under which he was willing to continue his interview: with Agents Helms and Kukura in Sherburne County. While it is entirely possible that Defendant placed that limitation on his willingness to continue the interview in order to earn a night in Sherburne County Jail, instead of Nicollet or Nobles County, the justification for his limitation does not sway the Court. *See Barrett*, 479 U.S. at 530 n.4 (noting that there may be "several strategic reasons why a defendant willing to speak to the police would still refuse to write out his answers to questions . . ."). Perhaps Defendant preferred to work with Agent Kukura, as the two had a previous relationship. Regardless of the justification, Defendant's limitation on the circumstances under which he would continue to discuss the matter before speaking with an attorney rule the day.

Furthermore, the Court finds that Defendant did not reinitiate the conversation, as required to remove his statements from the realm of inadmissibility. *See Edwards*, 451 U.S. at 484-85. Thus, when Agent Helms explained the process of transferring a case to federal jurisdiction, which included taking a confession to the United States Attorney's Office, Helms was questioning Defendant. The purpose of Helms's statement was to elicit a confession, and while it did not constitute a promise, it did constitute a question intended to evoke a response from Defendant.

Toward the end of Defendant's first interrogation in Nicollet County, Agent Helms returned with questions attempting to clarify whether Defendant had intended to invoke his right to counsel at any point so far. Defendant indicated that if he could not be transported to Sherburne County that day, he was "probably, [he was] requesting an attorney." Defendant again stated, "If Dave can meet us up there, I can sit down and talk with you and Dave." Helms clarified that Defendant would talk about "today, and other things," then left the room for a brief time. A short while later, Agent Helms returned and again clarified one of Defendant's conditions on continuing the conversation. Defendant confirmed he would continue talking only in Sherburne County with Agent Kukura present. He eliminated any need for Helms to accompany him to Sherburne, however. Thus, to the extent Defendant made incriminating statements after he stated his inclination to "plead the Fifth" and before being transported to Sherburne County, those statements should be suppressed.

Defendant relies heavily on his use of the words "want," "probably," and "counsel" with regard to his first two potential invocations. His reliance is misplaced. As discussed above, use of the word "probably," when followed in the same sentence with language indicating that a

defendant is considering the costs and benefits of invoking his right to counsel, is insufficiently clear to constitute an invocation of that right. At the hearing on this motion, Defendant stated:

> Initially, I said, "I want to probably talk to an attorney." Quote unquote, "I want to probably talk to an attorney." "I want" implies I want to talk to an attorney. "Probably" is very good likelihood. *Even though it's an ambiguous term*, it does imply in all likelihood that he does want to talk to an attorney.

(Dec. 19, 2012, Mot. Hr'g Tr. at 9:18-24 (emphasis added).) Defendant's argument that use of the word "probably" constitutes an unambiguous request for counsel flies in the face of Supreme Court precedent that the invocation must be a clear one. *Davis*, 512 U.S. at 462 ("But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect *might* want a lawyer. Unless the suspect actually requests an attorney, questioning may continue." (emphasis in original)). Furthermore, Defendant's claim that Helms was required to clarify any potential ambiguity is simply a legally unsupported position. When presented with the opportunity to adopt a "clarification requirement," the Supreme Court *explicitly* declined to do so. *Id.* at 461-62 ("But we decline to adopt a rule requiring officers to ask clarifying questions. If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.").

Therefore, the Court recommends that Defendant's statements at the Nicollet County Sheriff's Office following his limited invocation of his right to counsel be suppressed as violative of *Miranda*.[15]

---

[15] Because the Court recommends suppression of some statements given at Nicollet County, the Court did not rely on those statements in reviewing the search warrant affidavits for probable cause.

## C.   Sherburne County Statement

After being transported to Sherburne County, Defendant gave another statement following the advisement of his *Miranda* rights. Agent Kukura and Detective Sandland conducted this interview. The Court need not evaluate the voluntariness of Defendant's statement at Sherburne County because the circumstances did not change appreciably from those at Nicollet County. If anything, this statement was even *more* voluntary based on it being conducted in Sherburne County at Defendant's request. Furthermore, Defendant's statements at Nicollet County that he would waive his rights and continue the statement in Sherburne County with Agent Kukura constitute an explicit waiver of his rights. Accordingly, the only question is whether Defendant validly invoked his right to counsel.

The video of Defendant's interview at Sherburne County begins with Detective Sandland reading Defendant his *Miranda* rights from a pre-printed card. After Sandland finished reading the card, he asked Defendant whether he understood his rights, which Defendant acknowledged he did. Defendant immediately changed the subject to whether he would be able to remain in Sherburne County and the discussion stalled on that issue for a few moments.

Defendant mentioned counsel four times in Sherburne County. The first statement occurred approximately two to three minutes into his interview at Sherburne County. Defendant stated that he understood his rights, and he speculated that "an attorney would say 'don't say anything until you talk to an attorney,' so I am a little concerned about that . . . . Like you said, anything I say is going to be held against me in a court of law . . . . " This statement does not unequivocally indicate Defendant's desire to be represented by counsel at that interrogation. Indeed, this statement merely speculated as to what an attorney would advise him if he were to speak to one before continuing his interview. This statement underscored Defendant's deep

understanding of the serious consequences of continuing his interview. Armed with that knowledge, Defendant still did not unequivocally invoke his right to counsel.

Approximately six minutes into the interview, Defendant again mentioned counsel. He wondered aloud whether "it is to my advantage to have an attorney, you know, I know, to have an attorney advise me, you know. I am one that – I want to accept responsibility for what I've done – I have done it in the past. . . . I just wonder, before I do that – I just want to make sure I'm protecting myself as well." Viewing this statement as a whole leads the Court to the conclusion, that Defendant did not unequivocally request the assistance of counsel. Again, his ambiguous request was followed immediately by an equivocation—that he wanted to take responsibility. Whether it was wise, or whether he should have spoken with an attorney prior to giving a statement to "protect himself," were questions he was consciously considering before deciding to continue with his statement. His statement evidences that Defendant understood he did not need to continue the interview, but regardless, he persistently equivocated and continued to speak.

Approximately nine to ten minutes into the interrogation, Detective Sandland gave Defendant an unobstructed opportunity to invoke his right to counsel. Sandland noted that Defendant had "hemmed and hawed" about wanting an attorney, and Sandland wanted to confirm that Defendant was comfortable speaking with him "about Brewster." Defendant responded by saying, "By and large." This colloquy further reinforced Defendant's willingness to speak, but it also signified Sandland's recognition of Defendant's uncertainty.

About thirty minutes into his interrogation, Sandland asked Defendant to discuss the Wells Federal robbery. Defendant responded that he wanted to "work through everything" but he also wanted to make sure he was protecting himself. Sandland laid out certain facts and circumstances that tied Defendant to twenty-eight or twenty-nine other robberies and asked

Defendant to talk only about Wells Federal. After discussing the possibility of calling his wife, Defendant again brought up the idea of meeting with counsel. Defendant said he wanted to "say everything . . . But maybe I should have an attorney present then. I want to say everything." Defendant again reiterated his desire to "make sure I am protected to a certain extent." At this point, Detective Sandland terminated the interview.[16]

This statement, like the statements above, was equivocal. Defendant's use of the word "maybe" preceded and followed by an indication that he "want[ed] to say everything" cannot be reasonably viewed as an unambiguous request for the assistance of counsel. Accordingly, the Court finds that this statement was ambiguous and equivocal, and therefore, it did not validly invoke Defendant's right to counsel.[17]

Defendant repeatedly equivocated when discussing his thoughts on proceeding with or without the assistance of counsel. Whether Defendant injected ambiguity knowingly or whether he simply kept missing the mark is irrelevant. The fact is, with the exception of his limited invocation near the conclusion of his statement at Nicollet County, Defendant's invocations were equivocal and ambiguous. Accordingly, it is the Court's recommendation that only statements or admissions Defendant made between his limited invocation of his right to counsel at Nicollet County, wherein he would otherwise be inclined to invoke the Fifth, and his interview at Sherburne County with Agent Kukura, be suppressed. No other invocations were valid and once Defendant was transported to Sherburne County, his conditions had been met and he voluntarily

---

[16] While Detective Sandland left the interview room at this point, Agent Kukura remained in the room, and he and Defendant engaged in a brief, mostly innocuous conversation. Defendant made a few errant statements before the recording ended, one of which was, "Maybe I just belong in jail." Accordingly, the Court will determine whether Defendant's last statement validly invoked his right to counsel and whether the ensuing statements are admissible.

[17] Sandland's decision to end the interrogation after an equivocal, ambiguous invocation of Defendant's right to counsel has no bearing on the validity of any of Defendant's previous equivocal invocations, despite the invocations' similarities.

spoke with law enforcement. Accordingly, the Court recommends that the remainder of Defendant's statements be deemed admissible. Thus, the Court recommends Defendant's motion to suppress statements, admissions, and answers be granted in part and denied in part.

## V. Recommendation

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 47) be **DENIED**; and

2. Defendant's Motion to Suppress Statements, Admissions, and Answers (ECF No. 48) be **GRANTED IN PART AND DENIED IN PART** as set forth fully herein.

Dated: February 8, 2013        *s/ Jeanne J. Graham*
                                       JEANNE J. GRAHAM
                                    United States Magistrate Judge

## NOTICE

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **March 11, 2013**. A party may respond to the objections within fourteen days after service thereof. Any objections or responses shall not exceed 3,500 words. The district judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made. The party making the objections must timely order and file the transcript of the hearing unless the parties stipulate that the district judge is not required to review a transcript or the district judge directs otherwise.